Antonio Landan Ach, demandante y apelante, *v.* Junta de Retiro de Funcionarios y Empleados Permanentes del Gobierno Insular, etc., demandados y apelados.

Núm. 9166.—*Sometido:* Junio 1, 1945. *Resuelto:* Junio 15, 1945.

*Lionel Fernández Méndez y Juan A. Faría,* abogados del apelante; Hon. Procurador General Interino Jesús A. González y *Guillermo Cintrón Ayuso, Oficial Jurídico,* abogados de los apelados.

El Juez Presidente Señor Travieso emitió la opinión del tribunal.

El peticionario apelante ocupó durante más de veinte años, con carácter permanente, el cargo de Sanitario en el Departamento de Sanidad del Gobierno Insular. Al aprobar la Ley de Presupuesto que había de regir durante el año fiscal de julio 1, 1942 a junio 30, 1943, la Asamblea Legislativa eliminó el mencionado cargo, quedando por ese motivo cesante el peticionario.

En la petición radicada ante la Corte de Distrito de San Juan se alega, en síntesis, lo siguiente:

En la fecha en que tuvo efecto su cesantía, el peticionario tenía más de 60 años de edad, había servido al Gobierno

Insular por más de 20 años y durante más de diez años pagó sus cuotas al Fondo de Retiro. El sueldo que percibía era de $50 mensuales. Al quedar cesante, el peticionario solicitó de la Junta de Retiro demandada, que le liquidara su pensión de conformidad con la sección 8 de la Ley núm. 23 de 16 de julio de 1935 ((2) pág. 127), según la cual tendría derecho a una renta anual de carácter vitalicio igual a un 50 por ciento del sueldo que estaba devengando en la fecha en que se le separó involuntariamente del cargo. Alega el peticionario que la demandada se ha negado a hacer la liquidación en la forma indicada y solicita se expida un auto de *mandamus* ordenando a la Junta de Retiro que proceda a liquidar y a pagar al peticionario una renta vitalicia igual al 50 por ciento del sueldo anual de $600 que percibía el peticionario en la fecha en que su cargo quedó eliminado.

La Junta demandada alegó en su contestación que el peticionario no tiene derecho a que se le compute su pensión como retiro involuntario; que sólo tiene derecho a la pensión correspondiente al retiro voluntario por edad, la cual debe ser computada de acuerdo con las secciones 4 y 9 de la Ley de Retiro; y que de acuerdo con la sección 8 de dicha ley, para tener derecho a pensión por separación involuntaria el interesado debe solicitarla "antes de tener derecho a retiro", no siendo así el caso del peticionario, pues cuando éste solicitó el retiro por separación involuntaria ya tenía derecho a solicitarlo por razón de su edad.

La corte inferior dictó sentencia declarando sin lugar la demanda. Apeló el peticionario y en apoyo de su recurso alega que la corte sentenciadora erró al interpretar la sección 8 de la Ley núm. 23 de julio 16 de 1935 y al aplicarla a los hechos del presente caso.

Examinaremos las disposiciones legales pertinentes a la controversia entre las partes.

La sección 4 de la citada Ley de Retiro[1] provee que se concederá el retiro con renta vitalicia por razón de edad, por incapacidad física, por el número de años de servicio o por separación involuntaria. Para tener derecho a retiro son requisitos esenciales (a) que el empleado se encuentre en servicio activo en el momento en que lo solicite y (b) que haya cotizado al Fondo de Retiro por más de diez años.

La sección 5 de la misma Ley[2] dispone que cuando un empleado que se encuentre en servicio activo cumpla la edad de 60 años y haya prestado servicios por 20 años, "tendrá derecho a ser retirado al así solicitarlo", debiendo fijarse el montante de su pensión vitalicia de acuerdo con lo dispuesto en las secciones 4 y 9 de la ley. La sección 7 dispone que cualquier empleado "que haya alcanzado la edad de cincuenta y cinco años . . . y que haya prestado por lo menos veinticinco (25) años de servicios" y "cualquier funcionario o empleado que haya prestado por lo menos treinta (30) años de servicio, sin límite de edad, tendrá derecho a ser retirado con una renta vitalicia computada de acuerdo con las disposiciones de las secciones 4 y 9."

[1]"Sección 4.—El retiro se concederá con renta vitalicia por razón de edad, por incapacidad física, por el número de años de servicios prestados, o por separación involuntaria, de acuerdo con las disposiciones de esta Ley. En ningún caso se concederá una renta vitalicia cuyo importe exceda del 75 por ciento del promedio de los sueldos o compensaciones básicas anuales recibidos por el solicitante durante los últimos diez años de servicios prestados; ni excederá nunca dicha renta vitalicia de mil quinientos (1,500) dólares al año. El término "sueldo o compensación básica," usado en esta Ley, se entenderá que excluye de sus efectos todo bono, obvención, remuneración por servicios extraordinarios o compensación dada en adición al sueldo fijado al cargo por ley o reglamento. Disponiéndose, que no se concederá retiro alguno a aquellas personas que no estuvieren en servicio activo en la fecha en que lo soliciten, ni a las que hayan cotizado al Fondo de Retiro por un período menor de diez años."

[2]"Sección 5.—Todo funcionario o empleado en servicio activo, a quien sea aplicable esta Ley, que alcanzare la edad de sesenta (60) años y hubiese prestado por un término no menor de veinte (20) años, servicios computados de acuerdo con la sección 3 de esta Ley, tendrá derecho a ser retirado al así solicitarlo y el montante de la renta vitalicia a que tendrá derecho será fijado de acuerdo con las disposiciones de las secciones 4 y 9 de esta Ley."

Es evidente que cuando un empleado solicita su retiro de acuerdo con el derecho que le conceden las secciones 5, 6 y 7 de la Ley de Retiro, o sea cuando el empleado se retira voluntariamente del servicio por razón de edad, o por incapacidad física o por años de servicio, la pensión vitalicia a que tiene derecho y el término de los servicios prestados deberán ser determinados de conformidad con la dispuesto en las secciones 4 y 9 de la Ley.

En el presente caso no se trata de un retiro voluntario. Al comenzar a regir la Ley de Presupuesto por la cual se eliminó el cargo que ocupaba el peticionario, éste se encontraba en servicio activo, había cumplido los 60 años de edad y los 20 de servicio y había pagado sus cuotas al Fondo de Retiro por más de diez años. Tenía, por tanto, derecho, de acuerdo con la sección 5, "a ser retirado al así solicitarlo", pero no estaba obligado a retirarse. El peticionario, no obstante haber cumplido la edad de sesenta años, tenía derecho a continuar ocupando la plaza de Sanitario; y mientras dicha plaza existiera, nadie hubiese podido obligarle a retirarse de ella por razón de su edad o del número de años de servicio. No habiendo sido destituído de su cargo por causa justificada, de acuerdo con la Ley del Servicio Civil, ni solicitado su retiro del servicio por razón de edad, incapacidad física o por años de servico, el peticionario tiene derecho a que se le compute la pensión vitalicia de acuerdo con la disposición legal aplicable a los casos en que el empleado ha sido separado del cargo en contra de su voluntad.

La sección 8 de la Ley núm. 23 de 1935, que es la que consideramos aplicable a los hechos del presente caso, dispone:

"Sección 8.—Si un funcionario o empleado a quien esta Ley sea aplicable, de 45 años de edad, antes de tener derecho a retiro fuere separado involuntariamente por cualquier motivo, excepto destitución del Servicio Civil Clasificado o no clasificado, después de haber servido por un período no menor de veinte (20) años, tendrá derecho a recibir,

desde la fecha en que cesare en su cargo, de un cincuenta por ciento del sueldo que estuviere devengando al tiempo en que cesare en sus funciones oficiales hasta tanto sea repuesto por la Comisión de Servicio Civil en un cargo igual o similar al que desempeñaba, y para lo cual será deber de dicha Comisión, sin excusa ni pretexto alguno, comunicar el nombre de dicho empleado al Jefe del Departamento en que hubiere vacado la plaza y éste deberá nombrar al citado empleado para la referida vacante. Si el empleado así nombrado declinare dicho nombramiento, cesará *ipso facto* la pensión que percibe y la Junta de Retiro procederá a dar de baja su nombre de la nómina de los pensionados; Disponiéndose, sin embargo, que si el empleado de tal modo separado involuntariamente tuviere sesenta (60) o más años de edad, la renta que se le concederá será de carácter vitalicio, sin derecho a reposición, pero en ningún caso recibirá una pensión anual mayor de mil quinientos (1,500) dólares.''

La corte inferior opinó que el peticionario no tenía derecho a pensión con renta vitalicia por separación involuntaria, porque en la fecha en que dicha separación tuvo efecto el peticionario tenía derecho a retiro voluntario.

La interpretación dada por la corte inferior a la sección 8, supra, está en abierta contradicción con la que le dió esta Corte en *Del Valle* v. *Junta de Retiro*, 62 D.P.R. 208. Los hechos y la cuestión legal planteada en el citado caso eran prácticamente idénticos a los del caso de autos. Al sostener la contención del empleado peticionario, dijimos:

''La citada sección 8 provee un procedimiento exacto y completo para la computación de la pensión de los retirados involuntariamente del servicio. Los requisitos esenciales para tener derecho a pensión son (*a*) tener más de 45 años de edad y (*b*) haber servido al Gobierno Insular durante más de veinte años. El aquí peticionario y apelado tiene más de 45 años de edad, ha servido por más de veinte años y ha sido separado involuntariamente de su cargo. Si el peticionario tuviese menos de 60 años de edad, tendría derecho a recibir la mitad del sueldo que antes recibía, sin limitación alguna, hasta su reposición en otro cargo, de manera que si su sueldo fuera de $6,000 anuales, la pensión sería de $3,000 anuales. Teniendo el peticionario más de sesenta años de edad y más de veinte de servicios y habiendo sido separado involuntariamente del cargo, la renta vita-

licia a que tiene derecho de acuerdo con la sección 8 debe ser igual al 50 por ciento del sueldo que estaba devengando cuando cesó en el cargo, siempre que no exceda de $1,500 anuales. Las secciones 4 y 9, supra, no son aplicables a un caso como el de autos.''

La Junta demandada ha tratado de establecer una distinción entre el caso de *Del Valle* y el de autos, alegando que en el primero el empleado peticionario no tenía derecho a retiro en la fecha en que fué separado involuntariamente de su cargo, porque para esa fecha había cotizado al Fondo de Retiro por un período menor que el de diez años fijado por la sección 4 de la Ley. Aceptando, sin admitirlo, que exista tal distinción, ella carece en absoluto de importancia cuando se trata de casos de separación involuntaria, como lo es el presente y lo era el de *Del Valle*. El propósito del legislador, expresado en la sección 8 de la Ley, es proteger al empleado público que ha prestado servicios por más de 20 años y tiene más de 45 años de edad, pero que por no haber cumplido la edad de sesenta años—que es la que le permitiría retirarse voluntariamente por razón de edad—no ha adquirido aún el derecho a retiro. Cuando un empleado que se encuentra en esas condiciones es separado involuntamente de su cargo, *ipso facto* adquiere el derecho a una pensión igual al cincuenta por ciento del sueldo que estaba devengando en la fecha de su separación, hasta que sea repuesto en otro cargo igual o similar al que antes ocupara. Cuando el empleado involuntariamente separado del servicio tiene más de 60 años de edad, el deseo expreso del legislador es que continúe fuera del servicio, sin derecho a reposición, y que reciba una pensión vitalicia igual a la mitad del sueldo que antes devengaba, siempre que no exceda de $1,500 anuales. Si la voluntad legislativa fuera que la pensión en un caso de separación involuntaria, como el presente, debe computarse de acuerdo con las secciones 4 y 9 de la Ley, muy fácil le hubiera sido al legislador decirlo así expresamente, como lo hizo en las secciones 5, 6 y 7 de la Ley, referente a los casos de retiros voluntarios.

No podemos aceptar que la intención legislativa haya sido conceder al empleado que ha sido involuntariamente separado, antes de tener derecho a retiro voluntario, una pensión mayor que la concedida al empleado que habiendo adquirido el derecho al retiro, por razón de edad, años de servicio y cotización, es separado involuntariamente del servicio, por supresión del cargo.

*La sentencia recurrida debe ser revocada y en su lugar se dictará otra ordenando a la Junta de Retiro demandada que proceda a liquidar y pagar al peticionario una renta vitalicia igual al 50 por ciento del sueldo anual de $600 que estaba percibiendo en la fecha en que fué involuntariamente separado del servicio, con las costas, incluyendo la suma de $100 para honorarios de abogado.*

Juan García Roca, et. al., demandantes y apelados, *v.* Central Alianza, demandada y apelante.

Núm. 9089.—*Sometido:* Marzo 12, 1945. *Resuelto:* Junio 15, 1945.

*Eduardo Pérez Casalduc,* abogado de la apelante; *Rafael B. Pérez Mercado,* abogado de los apelados.

▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Esta apelación se interpuso contra una resolución denegatoria de una moción de traslado. Se basó la resolución apelada en que la demandada no acompañó su moción de traslado de un *affidavit* de méritos.

▉▉▉ La moción está predicada en que la demandada, conforme resulta de las alegaciones de la demanda, es una corporación con domicilio en el distrito de Arecibo y en que se trata de un pleito de reivindicación de bienes inmuebles radicados todos dentro de dicho distrito, para el cual se solicitó el traslado.

La contención del apelado es que debió radicarse el affidavit de méritos y que la Regla 12(*b*) de Enjuiciamiento Civil no ha derogado los artículos del Código de Enjuiciamiento Civil que tratan de las mociones de traslado (*change of venue*).

De conformidad con la Regla 12(*b*), las defensas que en la misma se enumeran, y entre ellas la falta de competencia del tribunal (*improper venue*), deben levantarse mediante moción para desestimar la demanda, *Onna* v. *The Texas Co.*, 64 D.P.R. 520 (1945), o en la contestación alegando la falta de competencia. En caso de declararse con lugar la moción, el único remedio que puede concederse es la desestimación de la demanda por falta de competencia, sin perjuicio de que el demandante pueda radicar nueva demanda en la corte competente. 3 Fed. Rules Serv. 674, 675. La referida regla no está en conflicto con los artículos 75 al 85, inclusive, del Código de Enjuiciamiento Civil, referentes al lugar para la celebración de los juicios en asuntos civiles. La regla y los artículos del Código son armonizables. Cuando el demandado presenta su moción para desestimar la demanda por falta de competencia (*improper venue*) sin solicitar a la vez el traslado del caso a la corte correspondiente, el precepto legal aplicable es la regla 12(*b*), con arreglo a la cual

la corte donde se radicó la demanda no tiene otra alternativa, en caso de declarar con lugar la moción, que desestimar la demanda sin perjuicio de que el demandante radique un nuevo pleito ante la corte competente. *Duval* v. *Bathrick,* 3 Fed. Rules Serv. 12 *b* 23, Case 2; 31 F. Supp. 510.

Pero cuando como en el presente caso el demandado solicita el traslado del pleito (*change of venue*), rigen los artículos correspondientes del Código de Enjuiciamiento Civil, como si la regla 12(*b*) no existiera, pues se trata de una situación distinta. Armonizada la regla de procedimiento con los artículos del Código, réstanos determinar ahora si la moción de traslado que en este caso presentó la demandada debe ser desestimada por no haber sido acompañada de un affidavit de méritos.

Como hemos visto, la moción de traslado está predicada en el domicilio de la demandada y en la naturaleza del pleito. De la faz de la demanda aparece que el domicilio de la demandada radica dentro del distrito judicial de Arecibo, y que las fincas cuya reivindicación se solicita radican todas dentro del mismo distrito. En cuanto a la prueba de estos dos particulares—el domicilio del demandado y el sitio donde radican los bienes—el affidavit de méritos es claramente innecesario, puesto que el propio demandante los alega en la demanda.

■■ En lo que respecta a si la demandada tiene o no una buena defensa, se ha resuelto que cuando se trata de traslado por razón del domicilio del demandado o de reclamación de bienes inmuebles radicados en el distrito para el cual se solicita el traslado, el derecho del demandado a obtenerlo es absoluto. *Usera* v. *Luce & Co., S. en C.,* 58 D. P.R. 290, 295 (1941); *Silva* v. *Sucn. Báez,* 34 D.P.R. 742 (1925); *Font* v. *Castro,* 33 D.P.R. 784, 786 (1924). Si el derecho es absoluto, la corte no tiene discreción para negarlo, y consecuentemente el affidavit de méritos es innecesario.

136

Es verdad que el art. 82 del Código de Enjuiciamiento Civil no establece distinciones entre los distintos motivos de traslado al exigir el affidavit de méritos. Pero cuando como en el presente caso la presentación de ese affidavit no conduce a ningún fin práctico, puesto que de la faz de la demanda resulta la incompetencia de la corte para conocer del caso y el derecho absoluto del demandado a obtener el traslado, debemos concluir que la Asamblea Legislativa, en casos como el presente, no tuvo la intención de exigir tal affidavit, ya que no hemos de presumir que habría de exigir cosas inútiles.

Siendo innecesaria la presentación del affidavit de méritos bajo las circunstancias de este caso, erró la corte inferior al denegar el traslado por no haberse acompañado dicho affidavit. *Procede revocar la resolución denegatoria del traslado, declarar con lugar la moción y devolver el caso a la corte inferior para que remita los autos a la Corte de Distrito de Arecibo.*

In re Pablo Andino Espejo, querellado.

Núm. 62.—*Sometido:* Abril 5, 1945. *Resuelto:* Junio 15, 1945.

*Pablo Andino, pro se y Miranda & Miranda Esteve,* abogados éstos del querellado; *R. A. Gómez, Fiscal del Tribunal Supremo,* abogado de El Pueblo.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

El Fiscal de esta Corte, por delegación del Procurador General de Puerto Rico, instó el presente procedimiento de *disbarment* contra el abogado Pablo Andino Espejo, imputándole el haber otorgado, como notario, el 14 de octubre de 1944, una escritura pública a virtud de la cual Sixto Heleria Feliciano vendió a su concubina Gertrudis Cruz por el precio de "un dólar y otras consideraciones" una casa y solar, a pesar de constarle personalmente a dicho abogado que la mencionada propiedad desde hacía más de diez años no pertenecía al Sr. Heleria. Cumplidos todos los trámites de este procedimiento y por la apreciación de toda la prueba presentada el día de la vista consideramos que se han probado los siguientes hechos:

Que allá para el año 1929 Sixto Heleria Feliciano era dueño y tenía inscrita a su favor en el Registro de la Propiedad de San Juan una finca urbana, solar y casa, ubicada en Santurce; que por escritura pública número 16 otorgada ante el notario Victoriano M. Fernández el 18 de mayo de 1929, Sixto Heleria Feliciano vendió dicha propiedad a la mercantil N. Ortega & Cía., a través del socio gestor de la misma Señor Roberto Quintero, por el precio de $400, de los cuales la compradora retuvo $300 para pagar una hipoteca a favor de don Isidro G. Luiña, que gravaba la propiedad; que dicho gravamen fué cancelado por escritura pública número 16 otorgada el 29 de mayo de 1933 ante el notario Victoriano M. Fernández; que el 31 de julio de 1933 la mercantil N. Ortega & Co. por su socio gestor Roberto Quintero vendió la propiedad a Joaquín Bonilla, por escritura pública número 28 otorgada ante el mismo notario an-

tes mencionado; que ninguna de estas escrituras de traspaso y cancelación de hipoteca fué inscrita en el Registro de la Propiedad por lo que del mismo aparecía Sixto Heleria Feliciano como dueño.

Que el 2 de octubre de 1944 el querellado Pablo Andino Espejo visitó al Sr. Roberto Quintero en su casa residencia y le manifestó que representaba a un veterano que era el dueño de la casa que Quintero estaba administrando y cobrando sus rentas; que Quintero le informó que él le había comprado esa casa a Heleria en el año 1929 y se la había vendido a Bonilla años después, a lo que le contestó el querellado que ellos "habían estado cobrando la renta de la casa por espacio de todo ese tiempo y esa renta la van a tener que reembolsar," que "Aquí lo que podemos hacer es que yo me voy a ocupar de arreglar el asunto definitivamente. A este hombre hay que darle dinero" para que arreglase todas las escrituras y que si no atendía a la transacción iban a vender la casa; que Quintero le contestó que tendría que hablar con Bonilla que era quien había estado percibiendo las rentas de la casa y el querellado le contestó que podía esperarlo tres o cuatro días. Que en efecto Quintero impuso a Bonilla de lo ocurrido y ambos fueron donde el abogado de Bonilla, Lic. Eduardo H. F. Dottin, y le informaron lo ocurrido y dicho letrado les aconsejó que no dieran un centavo y que si Heleria vendía la casa sería una

---

(1)En cuanto a la visita que le hizo Quintero el Lic. Dottin declaró lo siguiente:

"Vino Roberto Quintero muy asustado también, y yo para asustarlo más le digo, "Mire, Bonilla tiene el derecho de demandar en ejecución, quiere la finca". Me dijo, "Ese hombre, ese abogado me ha dado unos días para que yo arregle con él, y que si no arreglo el asunto va a perder la finca. Le he dicho que la finca no es mía." "Sí, pero yo quiero que se arregle esto. ¿Y quién es el abogado o notario que ha estado interviniendo en esto?" "Pablo Andino." "¡Pablo Andino!" "Sí, me ha dado dos días y tengo que resolver." "Hombre, eso es un *bluff* de Pablo Andino, si lo ha hecho." Le dije, "Mire, no dé un centavo a nadie, que eso es una vagabundería de Heleria. No dé un centavo, no importa que la finca esté sin inscribir todavía. Él ha vendido en escritura pública, y no tiene para qué molestarse. Ahora, sí tráigame las escrituras."

venta nula e incurría en un delito grave.([1]) Se probó además, que en el mes de septiembre de 1944, Bonilla, a quien el Lic. Dottin había solicitado le consiguiera las escrituras de constitución de la sociedad Ortega & Cía. y la de venta original y cancelación de hipoteca, con el fin de poder inscribir la compra hecha por Bonilla, había hablado con Sixto Heleria para que le consiguiera la escritura en que él le había vendido a Ortega & Cía, ofreciéndole pagarle porque se la buscara; que Heleria ofreció hacerlo pero luego volvió donde él y le dijo que necesitaba dinero a lo que Bonilla le manifestó que le llevara la escritura que no saldría descontento; que cuatro o seis días después Heleria volvió donde Bonilla y le dijo "Voy a consultar con un abogado porque yo estoy mal" y se fué; que a los pocos días Quintero le informó lo ocurrido con el querellado.

Por último se probó que, a pesar de tener conocimiento el querellado que la casa y solar en cuestión habían sido vendidas por Heleria a Ortega & Cía. y por esta mercantil a Joaquín Bonilla hacía más de diez años, el 14 de octubre de 1944 o sea con posterioridad a su entrevista con Quintero, otorgó como notario la escritura número 53 a virtud de la cual Sixto Heleria Feliciano le vendió a su concubina Gertrudis Cruz (que se probó había sido sirvienta en la casa del querellado) por el precio de un dólar y otras consideraciones; que dicha escritura fué presentada en el Registro de la Propiedad de San Juan el 24 de octubre e inscrita el 25 de octubre de 1944; que con posterioridad a esta última fecha el querellado visitó al Lic. Dottin y le solicitó datos sobre la escritura de cancelación de hipoteca que le fueron suministrados y en el curso de la conversación, según la relata el Lic. Dottin, éste le dijo al querellado que le habían "avisado que Heleria trata de vender por segunda vez esa finca" y que el querellado entonces le informó que Heleria ya había vendido la finca y que él había hecho la escritura de venta y la había inscrito en el Registro; que el quere-

llado no le dijo a quién se había vendido pero que sí le dijo que "Heleria era un viejo veterano y como tal estaba interesado en el asunto"; que al día siguiente el Lic. Dottin comprobó en el Registro de la Propiedad que la finca había sido vendida por Heleria a su concubina y pocos días después el Lic. Dottin radicó, a nombre de Bonilla, en la Corte de Distrito de San Juan una acción sobre nulidad de la venta efectuada y anotó la demanda en el registro, y algún tiempo después el querellado, a nombre de Heleria y Gertrudis Cruz, contestó dicha demanda, estando el caso pendiente de vista.

El querellado prestó declaración en su defensa y negó que hubiera visitado al Sr. Roberto Quintero el 2 de octubre de 1944 y sostuvo que dicha visita no tuvo lugar hasta el 20 de noviembre de dicho año y que el motivo de la misma fué solicitar de Quintero la escritura de cancelación de la hipoteca de Isidro G. Luiña que gravaba la finca y que Quintero le dijo que no recordaba si la había hecho el Lic. Adrián Agosto o el Lic. Dottin y que fuera donde ellos; que fué donde el Lic. Agosto y éste le dijo que él no había otorgado la escritura y entonces estuvo en la oficina del Lic. Dottin y éste le suministró los datos y fué al Archivo General de Protocolos y obtuvo una certificación; que el Lic. Dottin le informó que Quintero le había dicho que Heleria le había pasado la casa a su concubina; que no fué hasta que estuvo en el Archivo General que se enteró que Heleria le había vendido la casa a Ortega & Compañía y que varios años después dicha mercantil se la había vendido a Joaquín Bonilla. En cuanto a la escritura otorgada por él el 14 de octubre de 1944 afirmó que lo había hecho a requerimiento de Gertrudis Cruz pues su exconcubino Heleria quería traspasarle la casa porque habían trabajado juntos y con lo que ganaron fué que Heleria compró la casa originalmente y que éste quería pasarle la casa gratis a Gertrudis y por eso fué que

él hizo constar que el precio de la venta era un dólar y otras consideraciones.(²)

De acuerdo con los hechos probados en este caso no tenemos duda alguna de que el 14 de octubre de 1944 cuando el querellado otorgó como notario la escritura a virtud de la cual Sixto Heleria Feliciano vendió a su concubina Gertrudis Cruz la casa en cuestión por la suma de un dólar y otras consideraciones, al querellado le constaba que Heleria no era el dueño de la propiedad por habérselo así informado el Sr. Quintero cuando el querellado lo visitó a principios del mes de octubre. Que el querellado le habló a Quintero en el sentido de que representaba a un veterano quedó corroborado por el testimonio del Lic. Dottin cuando afirmó que el querellado le había dicho que "Heleria era un viejo veterano" y asimismo quedó corroborado el hecho de que la visita que hizo el querellado a Quintero fué a principios del mes de octubre, y no en noviembre, pues el Lic. Dottin afirmó que el Sr. Quintero le visitó con más de tres semanas de antelación que el querellado y le informó que éste "le había pedido qué sé yo cuántas cosas." Es significativo, además, el hecho de que de acuerdo con la declaración del Sr. Bonilla, en el mes de septiembre de 1944 él ofreció pagarle a Heleria si éste le conseguía las escrituras originales y, que. al no adelantarle dinero, Heleria le manifestó que iba a con-

---

(²)En relación con la declaración del querellado es conveniente hacer constar que el Lc. Dottin, a repreguntas del propio querellado, declaró lo siguiente:

"P. ¿Qué tiempo transcurrió entre la visita que le hiciera a usted Quintero, anunciándole este asunto, y la visita mía?

"R. Quintero me parece que hizo más de una visita. Por lo menos dos.

"P. Un momento. Para aclarar. ¿Qué tiempo transcurrió entre la visita que dice que yo había estado en la casa de Quintero, y la visita mía?

"R. ¿Qué tiempo transcurrió entre la visita de Quintero, cuando me dijo que usted había ido donde él? *Más de tres semanas.*

"P. ¿No serán tres días?

"R. *No. El hombre vino a mi oficina diciéndome que usted había pedido qué se yo cuántas cosas,* le pedí escrituras, me trajo una, ésa no era suficiente, se fué, y me trajo la otra, para darle a su señoría las notas que le di en mi oficina." (Bastardillas nuestras.)

sultar con un abogado y a los pocos días fué que Quintero le informó a Bonilla de la visita que le hizo el querellado.

A nuestro juicio las alegaciones de la querella, en tanto en cuanto por ellas se imputa al querellado haber tenido conocimiento de que Sixto Heleria Feliciano no era dueño de la casa que vendió a su concubina el 14 de octubre de 1944 y que dicho hecho le constaba por habérselo así manifestado el Sr. Roberto Quintero el día 2 de octubre de 1944 cuando el querellado lo visitó y requirió, a nombre de un veterano que según el querellado era el dueño de la casa, para que le reembolsara las rentas de la casa, porque al veterano había que darle dinero o de lo contrario iba a vender la casa, han quedado plenamente comprobadas.

Siendo los actos realizados por el abogado Pablo Andino Espejo constitutivos de conducta inmoral en el desempeño de sus deberes profesionales, *procede separarlo del ejercicio de la abogacía y en su consecuencia también del notariado y eliminar su nombre del Registro de Abogados por el término de dos años, a partir de la fecha de la sentencia que en este caso se dictará.*

Ex parte Ramón Hernández Martínez,
peticionario y apelante.

Núm. 9112.—*Sometido:* Mayo 23, 1945. *Resuelto:* Junio 22, 1945.

*A. L. López,* abogado del apelante.

El Juez Presidente Señor Travieso emitió la opinión del tribunal.

Ramón Hernández Martínez radicó ante la Corte de Distrito de Humacao una solicitud *ex-parte* para que se declarase a él y a sus doce hermanos, únicos y universales herederos ab intestato de doña Francisca Martínez, madre de los trece.

La evidencia ofrecida en apoyo de la solicitud estableció los hechos siguientes:

Don Gregorio Hernández Rodríguez, natural de España, vino a Puerto Rico después de haber contraído allá matrimonio con Patricia Lacalle. Ya en Puerto Rico, Hernández sostuvo relaciones amorosas con Francisca Martínez, de las cuales nacieron los trece reclamantes de la herencia materna. Los nombres y fechas del nacimiento de cada uno de los trece hijos son:

Miguel Ramón, septiembre 25, 1895

Francisco, julio 12, 1897

Valentín, junio 12, 1898

Adela, marzo 17, 1900

Gregorio, noviembre 1, 1901

Petra, diciembre 15, 1902

Modesto, febrero 25, 1904

Serafina, julio 2, 1905

Florencio, abril 5, 1907

Jorge, abril 30, 1909

Nicolás, diciembre 19, 1911

Mariano, mayo 11, 1913

Alfonso, julio 23, 1915

El matrimonio entre Gregorio Hernández y Patricia Lacalle existió hasta mayo 13 de 1926, cuando quedó disuelto por sentencia de divorcio dictada por la Corte de Distrito de Humacao. En septiembre 19 de 1926, Gregorio Hernández, divorciado y Francisca Martínez, soltera, contrajeron matrimonio e hicieron constar en el acta matrimonial lo siguiente:

"Que ambos contrayentes han vivido maritalmente, habiendo procreado los hijos siguientes: (aquí los nombres y edades de los trece hijos), los cuales se reconocen."

En octubre 17 de 1944, la corte inferior dictó una resolución declarando herederos universales de doña Francisca Martínez a sus hijos legitimados Petra, Modesto, Serafina, Florencio y Jorge Hernández y Martínez. La solicitud fué declarada sin lugar en cuanto a los otros ocho hijos. El pe-

ticionario apeló, alegando que la corte inferior erró al interpretar las disposiciones del Código Civil referentes al reconocimiento de hijos naturales.

Los fundamentos de la resolución recurrida son:

1. La condición o estado de un hijo natural o ilegítimo ha de determinarse por la ley en vigor a la fecha de su concepción o nacimiento, según el caso. (*Núñez* v. *Lacot,* 32 D.P.R. 81; *Morales* v. *Sucn. Cerame,* 30 D.P.R. 843; *Ramírez* v. *Ramírez,* 30 D.P.R. 617).

2. Habiéndose probado que el peticionario y todos sus hermanos son hijos de un hombre casado y de una mujer soltera, la condición o estado de cada uno de los hijos debe ser determinada en la forma siguiente:

(A) Los primeros cinco hijos, nacidos durante el período de 1895 a noviembre 1 de 1901, no son hijos naturales tal y como definía a éstos el artículo 119 del Código Civil que rigió en Puerto Rico hasta junio 30 de 1902.

(B) Que tampoco son hijos naturales los tres últimos, nacidos durante el período de diciembre de 1911 a julio de 1915, de acuerdo con lo dispuesto en el artículo 193 del Código Civil entonces vigente, o sea el que empezó a regir en marzo 9 de 1911.

(C) Que de acuerdo con las disposiciones legales citadas, las cuales son idénticas en ambos códigos, ninguno de los ocho hijos mencionados puede ser considerado como hijo natural, ni puede tampoco ser reconocido o legitimado, ya que todos fueron procreados y nacieron fuera de matrimonio, cuando sus padres no hubieran podido casarse por estar el padre casado con Patricia Lacalle. Siendo adulterina la filiación de dichos ocho hijos, éstos no podían ser legitimados por el subsiguiente matrimonio de sus padres. (Manresa, Tomo I, pág. 536; *Rivera* v. *Sucesión I. Díaz,* 36 D. P.R. 541).

(D) Los cinco hijos restantes, Petra, Modesto, Serafina, Florencio y Jorge, nacidos durante el período de diciembre

15 de 1902 a abril 30, 1909, nacieron bajo la vigencia del Código Civil que empezó a regir el 1 de julio de 1902. De acuerdo con el artículo 180 de dicho Código, que provee que "hijos ilegítimos son los nacidos fuera de matrimonio", y el artículo 193 que dispone que "los hijos nacidos fuera del matrimonio son legitimados por el subsiguiente matrimonio de sus padres, si con arreglo a la ley pudieren contraerlo o por autorización de este Código", los mencionados cinco hijos son hijos ilegítimos de Francisca Martínez, quedaron legitimados por el subsiguiente matrimonio de sus padres y tienen, de acuerdo con el artículo 194 del mismo Código, los mismos derechos y deberes de los hijos legítimos.

Arguye el apelante, que los trece reclamantes son hijos naturales de Francisca Martínez y por ella reconocidos; que ese hecho quedó establecido por la evidencia documental; que las manifestaciones hechas por los padres en el acta de matrimonio no pueden alterar el *status* de hijos naturales de Francisca Martínez, adquirido por los reclamantes desde el momento en que nacieron; que el principio de que la condición de un hijo natural o legitimado ha de determinarse por la ley en vigor en la fecha de su concepción o nacimiento, no es de aplicación al presente caso, pues lo que aquí se discute es el derecho de los hijos naturales de doña Francisca Martínez a heredar a su madre, y no se trata de la herencia del padre.

No es cierto, como alega el apelante, que de las actas de nacimiento presentadas en evidencia aparece que todos los presuntos herederos fueron inscritos como hijos naturales reconocidos de Francisca Martínez. Hemos examinado dichas actas y encontramos que los tres primeros hijos, Miguel Ramón, Francisco y Valentín, y el séptimo, Modesto, fueron inscritos como hijos de matrimonio civil de don Gregorio Hernández, natural de España, vecino de San Lorenzo y de doña Francisca Martínez, natural y vecina de San Lorenzo. Todos los demás fueron inscritos como hijos naturales de doña Francisca Martínez.

De la prueba ofrecida por el propio peticionario resulta que los trece reclamantes son el fruto de las relaciones amorosas habidas entre Gregorio Hernández y Francisca Martínez; y que en las fechas de la concepción y del nacimiento de cada uno de ellos, los padres no hubieran podido casarse, pues aun cuando la madre era soltera el padre estaba casado con Patricia Lacalle.

■■ La ley aplicable a los primeros cinco hijos, nacidos desde septiembre 25, 1895 a noviembre 1, 1901 es la contenida en los artículos 119, 120 y 122 del Código Civil que rigió en Puerto Rico hasta junio 30 de 1902, que disponían lo siguiente:

"Artículo 119.—Sólo podrán ser legitimados los hijos naturales.
Son hijos naturales, los nacidos fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos pudieron casarse sin dispensa o con ella."
"Artículo 120.—La legitimación tendrá lugar:
1. Por el subsiguiente matrimonio de los padres.
2. Por Concesión Real.
"Artículo 122.—Los legitimados por subsiguiente matrimonio disfrutarán de los mismos derechos que los hijos legítimos."

El derecho de estos primeros cinco hijos se basa en la alegada legitimación de los mismos por el matrimonio de los padres celebrado en 1926. En sus Comentarios al artículo 119, supra, dice Manresa:

"El matrimonio no legitima por sí solo más que a los nacidos en él, aunque hayan sido concebidos antes; y para que legitime a los anteriormente nacidos, es preciso que concurra en ellos la condición de naturales y el reconocimiento de los padres: de modo, que sólo concurriendo estos dos requisitos pueden ser legitimados. Toda otra interpretación respecto a la fuerza *ipso jure* del matrimonio subsiguiente, . . . . . . se sale de los términos de la ley."

Faltando a cada uno de dichos cinco hijos la condición de hijo natural, por ser hijos de padre casado y madre soltera que al tiempo de la concepción de aquéllos no podían casarse,

ninguno de ellos podía ser legitimado por el subsiguiente matrimonio de los padres, ni en ninguna otra forma.

■ La condición o estado de los tres últimos hijos nacidos entre diciembre 19, 1911 y julio de 1915 debe ser determinada de conformidad con lo dispuesto en el Código Civil que empezó a regir el 9 de marzo de 1911. De acuerdo con los artículos 187 a 191 de dicho Código, sólo los hijos naturales tienen derecho a ser legitimados por el subsiguiente matrimonio; y el artículo 193 considera "hijos naturales" a los nacidos fuera de matrimonio, de padres que al tiempo de la concepción o del nacimiento de aquéllos pudieron casarse sin dispensa o con ella. Ese mismo artículo disponía que el hijo natural podía ser reconocido por el padre y la madre, conjuntamente, o por uno de ellos solamente, en el acta de nacimiento o por testamento o mediante escritura pública.

La corte inferior no erró al resolver que estos tres últimos hijos, al igual que los cinco primeros, no fueron ni podían ser legitimados por el subsiguiente matrimonio de los padres.

■ ¿Fueron o podían ser reconocidos el peticionario y sus hermanos, por las manifestaciones que aparecen en las actas de nacimiento, hechas por los padres o por la madre solamente? La contestación debe ser en la negativa, en cuanto a los primeros cinco y a los últimos tres hijos, por carecer todos ellos de la condición de hijos naturales, sin la cual ni el padre ni la madre podrían reconocerles legalmente, de acuerdo con la ley vigente en las fechas en que nacieron. Art. 129, Código Civil Español; art. 193, Código Civil de 1911.

■ ¿Qué efecto legal, si alguno, pudo tener el acto de la madre, al inscribir a los primeros cinco hijos como sus hijos naturales?

El artículo 129 del Código Español disponía que "el hijo natural puede ser reconocido por el padre y la madre con-

juntamente, o por uno solo de ellos''. Y el artículo 130 proveía lo siguiente:

"En el caso de hacerse el reconocimiento por uno solo de los padres, se presumirá que el hijo es natural, si el que lo reconoce tenía capacidad legal para contraer matrimonio al tiempo de la concepción.''

Cuando siendo soltera y teniendo capacidad legal para contraer matrimonio, Francisca Martínez inscribió como su "hijo natural'' a Adela, nacida en marzo 17 de 1900 y a Gregorio, nacido en noviembre 1 de 1901, el art. 130 del Código Civil Español, supra, regía aún en esta isla.

. En sus Comentarios a los artículos 129 y 130, (Tomo 1, págs. 563–4) dice Manresa:

"Interpretando el art. 130, declara el Tribunal Supremo, en sentencia de 9 de junio de 1893, que dicho artículo no define la filiación natural, sino que dándola por definida en el 119, y presuponiendo la facultad que el 129 otorga a los padres para que cada cual de ellos pueda reconocer separadamente al hijo que tenga esa calidad, se limita a declarar como una consecuencia lógica de tal facultad, que el hijo así reconocido *se presume* natural si el que lo reconoce tenía capacidad para contraer matrimonio al tiempo de la concepción. Siendo esto así las presunciones pueden destruirse mediante prueba en contrario, y el Código permite expresamente la impugnación en el art. 138, que concede a las personas que resultaren perjudicadas por el reconocimiento del hijo natural, acción eficaz para destruir la presunción, no solamente cuando se hubiera faltado a las prescripciones relativas al acto del reconocimiento, sino también cuando éste recayere en favor de un hijo que no reúne las condiciones que para ser calificado de natural requiere el art. 119.''

En el caso de autos, la presunción que surgió a favor de dichos hijos, como consecuencia de las declaraciones de la madre, fué destruída por la prueba en contrario presentada por el propio peticionario, mediante la cual se estableció que todos y cada uno de los hijos fueron concebidos y nacieron cuando sus padres no estaban en libertad para contraer matrimonio.

El pronunciamiento de la resolución recurrida en cuanto a los otros cinco hijos, dice así:

"Petra, que naciera en 15 de diciembre de 1902, Modesto, Serafina, Florencio y Jorge, que nacieron desde entonces hasta el 30 de abril de 1909, fecha en que naciera éste último, son hijos ilegítimos de Francisca Martínez, que fueron más tarde legitimados por el matrimonio subsiguiente de sus padres, doña Francisca Martínez y don Gregorio Hernández Rodríguez, efectuado en San Lorenzo, el día 20 de septiembre de 1926 y en cuyo acto reconocieron los hijos habidos en sus relaciones amorosas."

Las disposiciones legales en que se basa el anterior pronunciamiento son las del Código Civil que comenzó a regir el 1º de julio de 1902 y estuvo en vigor hasta el 9 de marzo de 1911. El artículo 180 de dicho cuerpo legal, define a los "hijos ilegítimos" como aquellos "nacidos fuera del matrimonio", sin establecer distinción alguna entre el hijo ilegítimo cuyos padres no estaban en la fecha de su concepción o nacimiento en libertad para contraer matrimonio, por ser uno de ellos casado; y el hijo cuyos padres hubieran podido casarse en la fecha de la concepción o del nacimiento.

El art. 193 del mismo Código Civil de 1902, dispone:

"Los hijos nacidos fuera del matrimonio son legitimados por el subsiguiente matrimonio de sus padres, si con arreglo a la ley pudieren contraerlo o por autorización de este Código."

A primera vista, el artículo transcrito parece proveer que todos los hijos nacidos fuera de matrimonio, tanto los naturales como los adulterinos, quedan legitimados por el subsiguiente matrimonio de sus padres. Si el legislador se hubiese detenido ahí, su intención hubiera quedado claramente expuesta. Empero, agregó la frase "Si con arreglo a la ley pudieren contraerlo", y es esa frase la que nos obliga a interpretar la intención que tuvo el legislador al redactar el artículo 193 en la forma en que lo hemos transcrito. ¿Se refiere el legislador a la capacidad legal de los padres, para casarse, en el momento de la concepción o del nacimiento del

niño, o a la capacidad legal para contraer el matrimonio subsiguiente, base y fundamento de la alegada legitimación?

A nuestro juicio lo que quiso decir el legislador es que el subsiguiente matrimonio de los padres de hijos ilegítimos produce el efecto legal de legitimar a dichos hijos, si los padres hubieran podido contraer matrimonio en la fecha en que aquéllos nacieron. En otras palabras, el legislador quiso conservar la distinción entre el hijo natural, nacido fuera del matrimonio de padres libres para casarse, y el hijo adulterino, nacido también fuera del matrimonio, pero de padres que en la fecha de su nacimiento no hubieran podido casarse por ser ambos o por lo menos uno de ellos, casado. Esa es la única interpretación lógica que puede darse a la frase "si con arreglo a la ley pudieren contraerlo". Sería un absurdo resolver que el legislador se refería al matrimonio subsiguiente, pues es obvio que si éste se celebrara en contravención de la ley, sería nulo y la legitimación no existiría.

La interpretación que hemos dado a los artículos 180 y 193, supra, encuentra apoyo en las disposiciones del artículo 197 del mismo Código, que dice:

"La declaración de legitimidad no podrá obtenerse si al tiempo del nacimiento del hijo no hubieran podido sus padres contraer matrimonio con arreglo a este Código."

La corte inferior erró al declarar que los cinco hijos mencionados habían sido legitimados por el subsiguiente matrimonio de los padres. Empero, la resolución recurrida, en cuanto declara herederos de Francisca Martínez a sus hijos Petra, Modesto, Serafina, Florencio y Jorge, debe ser confirmada, por razones distintas a las expresadas por la corte inferior como fundamentos de su decisión.

El Código Civil que empezó a regir el primero de julio de 1902, que era la ley vigente en las fechas en que nacieron todos y cada uno de dichos cinco hijos, disponía en su artículo 187, lo siguiente:

"El hijo ilegítimo puede ser reconocido de cualquier modo, por el padre y la madre conjuntamente, o por uno solo de ellos."

152

De conformidad con lo dispuesto en dicho artículo, la inscripción que de cada uno de dichos cinco hijos hizo Francisca Martínez en el Registro Civil declarando que el niño era "hijo natural de la declarante", produjo el efecto legal de reconocer al niño así inscrito como hijo natural de Francisca Martínez y como tal, con derecho a participar en la herencia intestada de la madre, de acuerdo con lo dispuesto en el artículo 191 del mismo cuerpo legal. Véase: *Lucero* v. *Herederos de Vilá,* 17 D.P.R. 152.

Estamos de acuerdo con la corte inferior en que la Ley núm. 229 de mayo 12 de 1942 no es aplicable a los hechos y circunstancias de este caso, por ser dicha ley de carácter prospectivo. Véase: *Correa* v. *Pizá,* 64 D.P.R. 987.

*La resolución recurrida debe ser confirmada.*

THE COCA COLA EXPORT SALES Co., peticionaria, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado.

Núm. 49.—*Sometido:* Mayo 7, 1945. *Resuelto:* Junio 22, 1945.

*Hartzell, Kelley & Hartzell* y *Rafael O. Fernández,* abogados de la peticionaria; *Hon. Procurador General Interino Julio Suárez Garriga,* y *M. Velázquez Flores, Procurador General Auxiliar,* abogados del interventor, Tesorero de Puerto Rico, demandado en el pleito principal.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

La peticionaria es una corporación organizada bajo las leyes del Estado de Delaware, autorizada a hacer negocios en Puerto Rico. El 11 de marzo de 1942 radicó en el Departamento de Hacienda su declaración de ingresos correspondiente al año contributivo que empezó el primero de julio de 1941 y terminó el 30 de noviembre del mismo año. Acompañó su declaración de ingresos de un cheque por $8,542.25, que era la contribución que según la declaración de ingresos debía pagar, y unió una carta en la que hizo constar que pagaba bajo protesta la contribución, entre otras razones, porque siendo la contribuyente una corporación extranjera autorizada para hacer negocios en Puerto Rico, el imponerle el tipo contributivo de 20 por ciento cuando a las corporaciones domésticas se les imponía por el mismo concepto el tipo de 18 por ciento, era inconstitucional, e invocó el caso de *Nitrate Agencies Co.* v. *Domenech, Tes.,* 44 D.P.R. 515 (1933). Solicitó que al expedírsele el recibo se consignase al dorso su protesta.

Basándose en las secciones 64 y 75 de la Ley de Contribuciones sobre Ingresos, el 16 de febrero de 1943 solicitó del Tesorero el reintegro de $854.22, que constituía el 2 por ciento de su ingreso, cuya cantidad alegaba había pagado in-

debidamente. El 23 de julio de 1943 fué denegada la solicitud de reintegro, y de esa resolución apeló la contribuyente el 16 de agosto siguiente para ante el Tribunal de Contribuciones de Puerto Rico.

En su contestación alegó el Tesorero que el Tribunal de Contribuciones carecía de jurisdicción porque aunque la contribuyente decía haber pagado la contribución bajo protesta, el pago debía considerarse como voluntario, de conformidad con lo resuelto en *Blanco* v. *Tribl. de Apelación,* 61 D.P.R. 23 (1942). Alegó además el Tesorero que la contribución de 20 por ciento impuesta a las corporaciones extranjeras era constitucional.

El Tribunal de Contribuciones se declaró sin jurisdicción para conocer del caso, y consecuentemente desestimó la querella, invocando en apoyo de su resolución el caso de *Blanco* v. *Tribl. de Apelación,* supra, que sostiene que el pago de la contribución hecho bajo circunstancias similares a las del presente caso, no constituye uno bajo protesta, a pesar de que el contribuyente, al verificarlo, expresamente alegue que lo hace bajo protesta y se consigne así en el recibo de la contribución.

 Convenimos con el Tribunal de Contribuciones en que el pago en el presente caso fué voluntariamente hecho, pues al verificarlo la contribuyente no lo hizo por compulsión ni amenazas de embargo o de venta de sus bienes. *Blanco* v. *Tribunal de Apelación,* supra. Pero como hemos indicado, la reclamación de la peticionaria está basada en las secciones 64 y 75 de la Ley de Contribuciones sobre Ingresos,(¹)

---

---

cobradas sin autoridad, y toda contribución que aparezca injustamente impuesta o en cantidad excesiva o de cualquier manera erróneamente cobrada; y hará un informe a la Legislatura de Puerto Rico al empezar cada sesión ordinaria, de todas las transacciones que en esta sección se autorizan."